RECEIVED
SDNY PRO SE OFFICE
2026 AUG 10 PM 2:42

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————x

MERRIWETHER WILLIAMS,

Plaintiff,

v. Case No. 1:26-cv-01566-AS-SDA

ANTHROPIC PBC, *et al.*,

Defendants.

———————————————————————x

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT PALANTIR's MOTION TO DISMISS**

MERRIWETHER WILLIAMS
Plaintiff, *pro se*
44 Givens Avenue
Stamford, CT 06902
310-614-8721
Merriwether795@gmail.com

**TABLE OF CONTENTS**

I. INTRODUCTION .......... 1

STANDARD OF REVIEW .......... 3

II. WHAT PLAINTIFF CONCEDES .......... 3

III. PLAINTIFF HAS STANDING AS TO PALANTIR .......... 5

A. Plaintiff asserts no generalized grievance .......... 5

B. The injury is money, and Plaintiff states plainly where it went .......... 5

C. Traceability and the common mechanism .......... 6

D. *Mahon* and the honest limit .......... 7

E. Counts III and IV require no transaction .......... 7

F. Redressability .......... 8

IV. PARAGRAPH 22 SATISFIES RULE 8, AND THE MOTION USES IT AGAINST ITSELF .......... 8

V. COUNT III STATES A JUSTICIABLE CLAIM, AND AS TO THIS DEFENDANT IT IS THE CLAIM .......... 9

A. The claim arises under the Declaratory Judgment Act, not as a private action under the DTSA .......... 9

B. The controversy is real, and it has never been tested anywhere else .......... 10

C. Section 1839(3), applied to Palantir's own record .......... 11

D. What is claimed as proprietary sorts into three categories, and the sorting is the answer .......... 12

E. Ascertainability is a property of the mathematics. Scale is a property of capital .......... 13

F. A subtraction is not information, and cannot be a trade secret .......... 16

G. Not being able to explain published mathematics does not convert it into a secret .......... 21

H. The category, and the limits of the argument .......... 22

I. The Court should not decline jurisdiction in its discretion ...................... 23

VI. COUNT I STATES A CLAIM UNDER GENERAL BUSINESS LAW § 349 ........................................................................................................ 24

A. Consumer-oriented conduct — and Palantir has told a federal court the opposite of what it tells this one ........................................................... 25

B. The deception occurred in New York ................................................... 27

C. The materially misleading act is a half-truth, and the omitted fact is one Palantir generated ....................................................................... 27

D. The two available characterizations each defeat the representation ........ 29

E. Injury and causation .................................................................... 29

F. Count I is not preempted ............................................................... 30

VII. COUNT IV ASKS THE COURT TO RESOLVE A CONTRADICTION PALANTIR CREATED ....................................................................... 30

A. What the Complaint asks ............................................................... 30

B. Palantir's contradiction sits in a single sentence of its own marketing .... 31

C. The contradiction determines what may be owned ............................... 31

D. *Tilikum* addresses a different claim .................................................. 32

E. The Court need not pick a horn ........................................................ 32

VIII. THE RELIEF SOUGHT IS DISCLOSURE, AND AMENDMENT WOULD NOT BE FUTILE ............................................................... 32

CONCLUSION ............................................................................................ 35

**I. INTRODUCTION**

Palantir told the Federal Circuit it sells a commercial product. It tells this Court its product is industrial-scale and not consumer-oriented. It won on the first position, and asks this Court to accept the second.

The Complaint's allegation as to Palantir is one paragraph. It alleges that Palantir operates the Apollo deployment software and the Foundry and AIP systems, that those systems facilitate the industrial-scale deployment and enclosure of the Mathematical Commons, and it identifies Palantir's principal place of business and its New York office from Palantir's own Form 10-K. (FAC ¶ 22.)

The motion's single Palantir-specific argument is that this allegation cuts against a consumer orientation. (Mem. at 20.) That is the whole of what ten companies say about this Defendant across twenty-six pages.

Plaintiff's claim against Palantir is narrow, and it can be stated in one sentence. The public mathematics Palantir's platform executes contains a way to say *we do not know* — and that state does not survive into what Palantir sells as proprietary intelligence.

This is not an allegation that Palantir lacks adequate mathematics. It is the opposite. The mathematics for representing uncertainty in structured data is old, published, and free.

E.F. Codd gave null values and a three-valued logic a formal treatment within the relational model, then spent years refining the distinction between information that is missing and information that is inapplicable. E.F. Codd, *Extending the Database Relational Model to Capture*

*More Meaning*, 4 ACM Trans. Database Sys. 397 (1979); E.F. Codd, *Missing Information (Applicable and Inapplicable) in Relational Databases*, 15 SIGMOD Rec. 53 (1986).

An entire body of published database research addresses the representation of uncertain values and their provenance using relational models, relational algebra, and SQL-based systems. Benjelloun et al., *An Introduction to ULDBs and the Trio System*, 29 IEEE Data Eng. Bull. 5 (2006); Green, Karvounarakis & Tannen, *Provenance Semirings*, Proc. PODS 31 (2007); Dalvi & Suciu, *Efficient Query Evaluation on Probabilistic Databases*, 16 VLDB J. 523 (2007).

And for the specific operation at the center of Palantir's platform — deciding whether two records describe the same person — the foundational Fellegi–Sunter model specifies three possible dispositions rather than two: link, non-link, and a possible-link category for cases in which the evidence is insufficient for either decision, ordinarily subject to clerical review. Fellegi & Sunter, *A Theory for Record Linkage*, 64 J. Am. Stat. Ass'n 1183 (1969).

Palantir did not lack this mathematics. No one lacks it — that is what publication means. Its platform executes it, and Palantir has built the very mechanism the honest version requires: its platform tracks how data was produced, including the inputs and logic used to generate outputs. Palantir did not fail to obtain this mathematics. It operates on top of it and has built the very mechanism the honest version requires — its platform tracks how data was produced, including the inputs and logic used to generate outputs. Palantir, Foundry Documentation, "Introductory concepts"; "Data Lineage"; "Workflow Lineage." What the customer sees carries none of it.

Two questions follow, and Palantir has no third answer to either.

If Palantir's platform is neutral — a system that integrates the customer's existing data, which is what its own documentation says the ontology does — then it is a conduit, and a conduit has no license to discard a state its source material carries. Suppressing uncertainty is not neutrality. It is a decision.

If Palantir's platform is excellent — proprietary, category-defining, the thing competitors cannot lawfully replicate, which is what its marketing says — then it is measured against the best published method, and at the equivocal boundary it does less than the free one. Excellence is not a subtraction from the commons.

Neither answer supports the word Palantir charges for. That is the claim, and Palantir supplied both halves of it.

## STANDARD OF REVIEW

Well-pleaded allegations are taken as true and every reasonable inference drawn in Plaintiff's favor. A pro se submission is construed liberally and read to raise the strongest arguments it suggests. *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474–75 (2d Cir. 2006); *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009). The same construction governs allegations bearing on jurisdiction.

## II. WHAT PLAINTIFF CONCEDES

Plaintiff states six things at the outset. Each is true. None weakens the claim she brings, and several are necessary to it.

*She is not Palantir's customer.* She has never purchased a Palantir product, has paid Palantir nothing, and has not used its platforms. She seeks no damages, no restitution, and no disgorgement from Palantir in any amount.

*Count II is not asserted against Palantir.* Unjust enrichment reaches only a defendant enriched at the plaintiff's expense through a sufficiently direct relationship. *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511 (2012). Plaintiff's claims are Counts I, III, and IV.

*Palantir may charge for what it does.* Operating these platforms at scale requires substantial capital, infrastructure, and skilled human labor, and the Complaint says so. (FAC ¶¶ 3, 58.) Palantir may bill for execution.

*Palantir's code and its specific implementation are its own.* Its source code is protectable expression. Its indexing and query internals, its metadata services, its orchestration and connector engineering may be held as trade secrets, and Plaintiff does not contend otherwise. She challenges no Palantir copyright and no Palantir patent, and pleads no claim under either.

*Palantir's platform can preserve a null value.* Its documentation expressly contemplates an object having no value for a property where the backing datasource supplying that property contains no corresponding record, and describes whether a property is required as an administrator-configurable setting. (Palantir, Foundry Documentation, "Required properties"; "Properties and links.")

Plaintiff does not allege that the platform is incapable of leaving a cell empty, and this concession matters, because it isolates precisely what is missing. An empty cell reports that no

value was received. Nothing in a filled cell reports that the value in it was not warranted. Absence has a representation. Uncertainty does not.

*The claim is about the ingredients, not the recipe.* Palantir may own the specific arrangement it built. It may not own the mathematics that arrangement executes, and it may not tell the public that it does.

## III. PLAINTIFF HAS STANDING AS TO PALANTIR.

### A. Plaintiff asserts no generalized grievance.

This is not a suit against artificial intelligence. Plaintiff does not object to the existence of these systems, does not seek to impede the industry, and values the technology. She brings the claim of an ordinary consumer: she paid a premium in reliance on the representation that these Defendants sell proprietary technology protected by trade secrets (FAC ¶¶ 40, 62, 64), and she holds them to it.

### B. The injury is money, and Plaintiff states plainly where it went.

Plaintiff paid a subscription premium she would not have paid absent the proprietary representation. (FAC ¶¶ 5, 57, 59, 65, 71.) Monetary loss is the concrete harm Article III has always recognized. *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017); *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732 (2d Cir. 2017).

That premium was paid to Anthropic. (FAC ¶¶ 13, 57.) Plaintiff does not claim she paid Palantir. Her standing as to this Defendant rests on the industry-wide practice pleaded at ¶¶ 15 and 66–67

and on the declaratory controversy in Counts III and IV — not on a transaction that did not occur.

Saying so plainly is the beginning of the argument, not a concession that ends it.

**C. Traceability and the common mechanism.**

Traceability requires allegations supporting a reasonable inference that the injury was caused by the defendant's challenged conduct. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). The Complaint alleges a common practice with a specific core: the mathematics these systems execute is public, and each Defendant nonetheless represents its technology as proprietary and charges on that representation. (FAC ¶¶ 15, 40, 62, 66–67.)

Paragraph 66 alleges that each Defendant's enclosure reinforces and depends upon the others'. As to Palantir, that allegation has since been documented by Palantir.

In June 2026, Palantir announced availability on Google Cloud Marketplace, including two-way data federation between BigQuery and Foundry, two-way semantic exchange between Google's Knowledge Catalog and Foundry's Ontology, and deeper connectivity between Google's Gemini and Palantir's AIP. Palantir Technologies Inc., *Palantir Announces Availability on Google Cloud Marketplace* (June 4, 2026).

Gemini is a co-Defendant's model, executing the Transformer architecture that co-Defendant published. (FAC ¶¶ 18, 31.) It is a product Plaintiff uses. (FAC ¶ 14.)

Plaintiff does not claim that integration puts a dollar of hers in Palantir's pocket. It does not. It establishes that the interdependence pleaded at ¶ 66 is a commercial fact rather than an inference.

**D. *Mahon* and the honest limit.**

*Mahon v. Ticor Title Insurance Co.*, 683 F.3d 59 (2d Cir. 2012), holds that a plaintiff injured by one defendant does not thereby acquire standing to sue others who did not injure her. Plaintiff does not dispute the rule and will not pretend her position as to Palantir is her position as to Anthropic.

*Mahon* addressed a plaintiff who alleged no conduct by the non-transacting defendants bearing on her transaction. The conduct alleged here is a representation Palantir itself makes, about mathematics that is published and free, directed to the public in its marketing and to investors in its filings. Whether that suffices for Count I is a question this Court will decide. Counts III and IV do not depend on it.

**E. Counts III and IV require no transaction.**

The declaratory counts have no consumer-oriented-conduct element, require no purchase, and depend on no privity. They require an actual controversy between parties with adverse legal interests. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126–27 (2007).

One exists. Palantir asserts proprietary and trade-secret status in what it sells, both in its marketing and in legends placed on its customer materials, which state: "The information in this document is proprietary and confidential, and includes certain Palantir trade secrets." [ Palantir,

*Foundry for Supply Chain*; see also *Allocation+ with Palantir Foundry*; *Foundry for Anti-Financial Crime 360*.]

Plaintiff contends the mathematics those platforms execute is published, readily ascertainable, and incapable of being owned by anyone. Palantir asserts the status; Plaintiff disputes it; and no examiner, regulator, or court has ever tested the assertion.

**F. Redressability.**

The motion argues that relief against Palantir would return Plaintiff no money. Correct — she seeks none. Where the relief sought is declaratory, redressability is satisfied by resolution of the controversy itself. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006).

## IV. PARAGRAPH 22 SATISFIES RULE 8, AND THE MOTION USES IT AGAINST ITSELF.

The motion argues the Complaint lumps twelve defendants together without identifying what any of them did. (Mem. at 14–16.) The pleading devotes a separate, individuated paragraph to each. (FAC ¶¶ 16–27.)

Palantir's paragraph names Palantir, names three of its products — Apollo, Foundry, AIP — locates its principal place of business and New York office by reference to Palantir's own Form 10-K, and states what those systems do in the enclosure the Complaint challenges. (FAC ¶ 22.)

The motion's answer is to quote that paragraph back and argue that one word in it defeats the claim. (Mem. at 20.) That is not a Rule 8 objection. It is a merits argument about § 349's consumer-oriented element, addressed in Section VI below.

Rule 8 requires a short and plain statement giving the defendant fair notice of the claim and its grounds. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Paragraph 22 gave Palantir notice of precisely the claim its counsel has answered.

## V. COUNT III STATES A JUSTICIABLE CLAIM, AND AS TO THIS DEFENDANT IT IS THE CLAIM.

Count III seeks a declaration under 28 U.S.C. § 2201 that the mathematics Palantir's platforms execute cannot be enclosed as a trade secret, because it is readily ascertainable through proper means and therefore fails the statutory definition. 18 U.S.C. § 1839(3).

Unlike § 349, Count III has no consumer-oriented-conduct element, requires no consumer transaction, and depends on no privity. Against a defendant that sells to enterprise and government buyers, Count III is not a fallback. It is the claim, and Plaintiff asks the Court to take it up first.

### A. The claim arises under the Declaratory Judgment Act, not as a private action under the DTSA.

The motion argues that the DTSA creates no consumer cause of action and that Plaintiff has misappropriated nothing. (Mem. at 25.) Both are true and neither is responsive. Section 2201 authorizes a court to declare the rights and legal relations of any interested party in a case of

actual controversy. The DTSA supplies the standard the declaration would apply, not the cause of action.

The motion's own authority proves the distinction. In *National Special Pharmacy*, the party asserting trade secrets was the plaintiff, suing for misappropriation, and its catchall identification of its own secrets failed. *Nat'l Special Pharmacy, LLC v. Padhye*, 734 F. Supp. 3d 922, 929 (N.D. Cal. 2024).

The posture here is reversed. Plaintiff claims no trade secret and bears no burden to identify one. Palantir asserts the status, and the vagueness of what it claims is the condition Plaintiff asks the Court to address.

**B. The controversy is real, and it has never been tested anywhere else.**

The motion argues that no controversy exists because no Defendant has threatened Plaintiff with trade-secret litigation. (Mem. at 7–8, citing *Alvarez v. Smith*, 558 U.S. 87 (2009).) That framing would make the assertion unreviewable by design.

Trade secret is unlike every other form of intellectual property in one respect that governs this case. A patent requires an application, an examiner, and an enabling public disclosure. 35 U.S.C. § 112. A copyright registration is examined. A trademark is published for opposition. Trade secret requires none of it. A party asserts the status and no office reviews the assertion. There is no proceeding of any kind in which the claim is measured against § 1839(3) unless a court measures it.

Palantir has sought no patent on the record-linkage mathematics its platform executes, because that mathematics was published in 1969 and no patent was available. It has disclosed its ontology to no examining authority. It asserts proprietary and trade-secret status by saying so, in materials it writes, and charges accordingly. A declaration is not one avenue among several for testing that assertion. It is the only one that exists.

Nothing here is contingent. The representations appear in Palantir's materials today, and whether readily ascertainable mathematics can be a trade secret is a question of law requiring no further factual development.

**C. Section 1839(3), applied to Palantir's own record.**

Information qualifies as a trade secret only if it derives independent economic value from not being generally known and not being readily ascertainable through proper means, and only if its owner has taken reasonable measures to keep it secret. 18 U.S.C. § 1839(3). Each prong fails here, and Palantir's own documentation supplies the failure.

*Generally known.* Relational algebra, graph theory, and matrix operations are taught in undergraduate classrooms worldwide. (FAC ¶¶ 29, 32–33, 63.) Probabilistic record linkage has been in the peer-reviewed literature for fifty-seven years and is used openly by national statistical agencies.

*Readily ascertainable.* Palantir's documentation states that Foundry data types "are inspired by similar concepts in RDF, OWL and XSD." Palantir, Foundry Documentation, "Types reference." Those are open specifications published by the World Wide Web Consortium — published by

design, because publication is what a standards body does. Palantir has identified its own ingredients and identified them as public.

*No reasonable measures.* One does not take reasonable measures to keep secret a theorem in a 1969 journal or a specification the W3C publishes for the world to implement.

**D. What is claimed as proprietary sorts into three categories, and the sorting is the answer.**

Palantir markets the Ontology as its distinguishing proprietary asset. The representation survives only so long as it is never required to name what it covers. Require it, and every available answer falls into one of three categories.

*The idea, the method, the system.* Palantir's documentation describes the Ontology as a categorization of the world. (Palantir, Foundry Documentation, "Core concepts," Ontology heading.) A method of organizing information is not an invention. Copyright expressly excludes any procedure, process, system, or method of operation. 17 U.S.C. § 102(b). A treatise describing a system of bookkeeping confers no monopoly on the system. *Baker v. Selden*, 101 U.S. 99 (1879).

*The mathematics and the customer's own facts.* The open standards Palantir credits rest on description logic and graph theory. Its object, property, and link structure is the entity-attribute-relationship model, the canonical way to represent data since 1976. Mathematical formulae are basic tools of scientific work, free to all. *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972). And the contents — the objects, the property values — are the customer's own facts, which no one owns. *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340 (1991).

Palantir's chief executive has said as much in a different register, telling the enterprise market that "controlling your weights is controlling your fate." Palantir Technologies, *AI Sovereignty Is Your Alpha* (2026). Locating the value in the customer's own data and in possession of the machinery that processes it is precisely Plaintiff's position. Capital earns a fee for execution. It does not earn a secret.

*Palantir's code and specific implementation.* This category is real, and Plaintiff concedes it without hesitation. But it is ordinary software copyright and ordinary trade secret, no different in kind from any enterprise vendor's, and it is not what "the proprietary Ontology" is selling. It is not category-defining and it does not distinguish Palantir from anyone.

Made to choose, the representation fails either way. Claim the Ontology itself and the claim is false as a matter of law. Retreat to *we only ever meant our own code* and the representation collapses into *we wrote some software* — which is not what the premium is charged for, and not a trade secret in the mathematics at all.

Plaintiff asks this Court to invalidate no Palantir intellectual property and pleads no claim to do so. The sort is offered to show that what is labeled proprietary is not ownable, which is the § 1839(3) question.

**E. Ascertainability is a property of the mathematics. Scale is a property of capital.**

Palantir's answer will be that no person could reproduce what its platform does. That is true, and it is a different question.

Section 1839(3)(B) does not ask what it would cost to rebuild Palantir's platform. It asks whether the information is readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information. Congress chose that reference person deliberately: in 2016 it replaced the words "the public" with the current language. Pub. L. 114-153, § 2(b)(1)(A); *see United States v. Liew*, 856 F.3d 585, 597 (9th Cir. 2017). The statutory question is what a party positioned to exploit the information can discover — in practice, the owner's competitors.

Measured against that person, the answer is not close. The record-linkage rule was published in a statistical journal in 1969. The standards Palantir's own documentation credits are published by the World Wide Web Consortium for the express purpose of being implemented by others. Every entity capable of obtaining economic value from this information already has it, and several of them are co-Defendants in this action. Palantir's answer describes a barrier of capital, and addresses a reference person the statute does not name.

That conclusion does not rest on Plaintiff's characterization of the mathematics. It rests on the characterizations given by the people who published it.

Codd's founding paper on the relational model opens by describing itself as concerned with the application of "elementary relation theory" to systems providing shared access to large banks of formatted data, and states that "the term relation is used here in its accepted mathematical sense" — a set of n-tuples drawn from given sets. E.F. Codd, *A Relational Model of Data for Large Shared Data Banks*, 13 Commun. ACM 377, 377 (1970). The structure Palantir's ontology uses — objects, properties, and links — is that model together with the entity-relationship formulation

published six years later. Peter Pin-Shan Chen, *The Entity-Relationship Model — Toward a Unified View of Data*, 1 ACM Trans. Database Sys. 9 (1976).

The record-linkage literature describes its own mathematics in the same register. A peer-reviewed introduction states that "the basic mathematical specifications are derived algebraically from fundamental concepts of probability," while noting that the theory can be extended to more advanced mathematics. David E. Clark, *Practical Introduction to Record Linkage for Injury Research*, 10 Injury Prevention 186 (2004). The Census Bureau's own account is to the same effect: Fellegi and Sunter supplied the formal mathematical treatment of record linkage and demonstrated the optimality of the decision rules. William E. Winkler, *The State of Record Linkage and Current Research Problems*, U.S. Bureau of the Census, Statistical Research Div. (1999).

So the primitives are named, and named by their authors: sets, relations, first-order logic, and the algebra of probability. Plaintiff does not contend that Palantir's engineering is elementary, and the Complaint says the opposite. (FAC ¶ 3.) The distinction the statute draws is between engineering and information. A platform may be difficult to build, costly to operate, and impossible for an individual to replicate, while the mathematical operations it executes remain published, formally described, and available to any party positioned to use them. Section 1839(3) asks about the second, and the answer is on the shelf.

Plaintiff concedes without reservation that building and operating these platforms requires substantial capital, infrastructure, and skilled labor. (FAC ¶ 3.) Palantir may charge for that. (FAC ¶ 58.) The statute protects information that is hard to know. It does not protect information that is easy to know and expensive to run.

At the pleading stage, whether the unascertainable thing is the mathematics or the capital is a contested factual assertion about where value resides, and it resolves in Plaintiff's favor.

**F. A subtraction is not information, and cannot be a trade secret.**

This is the heart of Count III, and it follows from what Palantir's platform does with the mathematics it did not write.

Entity resolution answers a question: is this record and that record the same person? The published decision rule for that question returns three values. Above the upper threshold, a match. Below the lower, a non-match. Between them, where the evidence is equivocal, the rule returns neither — it designates a potential match and holds it for human review, and Fellegi and Sunter proved that rule optimal for fixed error bounds. Ivan P. Fellegi & Alan B. Sunter, *A Theory for Record Linkage*, 64 J. Am. Stat. Ass'n 1183 (1969).

Plaintiff does not allege that Palantir runs that 1969 rule. Palantir's own product page describes "every stage of the entity resolution pipeline — from fuzzy matching, to feature generation, to model training, to human validation." (Palantir, "Foundry Entity Resolution.")

The point does not depend on which matcher Palantir uses. Every probabilistic matcher, classical or machine-learned, produces a score, and every score has a middle. What the published

mathematics establishes is that the middle is an output — the optimal rule's third value — and not an error to be resolved away.

The third value is also more than an expression of doubt. Read what the rule directs: the equivocal pair is held for review. That is a routing instruction. The rule's architecture is to decide automatically where the evidence is strong and, where it is not, to send the case to the one thing capable of checking it — a person. The published mathematics does not merely supply a way to say *we are not sure*. It specifies when the check is needed and when it is not.

The same is true one level up, at the values the platform stores about people. The relational model has carried a representation for *unknown* since Codd introduced null values and three-valued logic, and Codd continued for years distinguishing information that is missing from information that is inapplicable. *See* E.F. Codd, *Extending the Database Relational Model to Capture More Meaning*, 4 ACM Trans. Database Sys. 397, 397–434 (1979); E.F. Codd, *Missing Information (Applicable and Inapplicable) in Relational Databases*, 15 SIGMOD Rec. 53, 53–78 (1986).

Published database research addresses the representation of uncertain values and their provenance together, in ordinary relational systems. *See* Omar Benjelloun, Anish Das Sarma, Chris Hayworth & Jennifer Widom, *An Introduction to ULDBs and the Trio System*, 29 IEEE Data Eng. Bull. 5 (2006).

And Palantir's own documentation credits open standards that operate on the opposite convention from a database: under those specifications, the absence of a statement does not establish that the

fact is false, while a closed-world database may treat what is not present as false. W3C, *RDF 1.1 Semantics*; W3C, *RDF Semantics* glossary.

The most concrete instance is disagreement between sources. Palantir's platform is sold to integrate data drawn from many enterprise systems, and its documentation describes object types backed by multiple datasources, with different sources supplying different properties of the same object. Palantir, Foundry Documentation, "Multi-datasource object types"; "Properties and links." Those systems do not always agree. Palantir has addressed that case directly: “these received values must be transparently resolved with a conflict resolution strategy.” *Palantir, How User Edits Are Applied, “Resolve Conflicting User Edits and Datasource Updates.”*

That is Palantir's own account of both the ordinary case and its answer to it. Where two sources hold different values for the same property of the same person, the platform applies a configured rule and one value is written. The rule selects a winner. What appears in the record is the winner. Nothing in the property value reports that a second value existed, that it differed, or which rule chose between them.

Plaintiff does not allege that any resolution rule is wrong and does not ask this Court to prescribe one. She alleges that the fact of the disagreement — which the platform necessarily possesses at the moment it applies the rule — is not carried forward to the person who reads the result.

So the mathematics for saying *we do not know* exists at every layer of what Palantir built, and Palantir named its sources.

What Palantir sells carries none of it.

Palantir's documentation describes the ontology as an operational layer through which agents and applications read and write data and execute actions governed by the ontology, with writes pushed back to enterprise systems. Palantir Technologies Inc., *Example use cases for Ontology MCP (OMCP)*, Palantir Foundry Documentation (last visited Aug. 9, 2026) (agents connect to the customer's source of truth to "read and write data, and execute actions governed by your ontology," with written data immediately visible to other users and applications sharing that ontology); *Why create an Ontology?*, Palantir Foundry Documentation (last visited Aug. 9, 2026) (actions governed with the same granular access controls as data and logic primitives and "securely written back to every enterprise substrate"); *Ontology building*, Palantir Foundry Documentation (last visited Aug. 9, 2026) (describing the Ontology as an operational layer and, in many settings, a digital twin of the organization, with "granular security and governance for all changes").

A resolved entity appears there as a resolved entity. Nothing in that presentation distinguishes a resolution the evidence supports from one falling in the band the published rule assigns to review.

Nor is the honest version something Palantir would have to build. Its own introductory documentation states: "Every dataset in the Palantir platform maintains a record of how it was produced." Palantir Technologies Inc., *Introductory concepts*, Palantir Foundry Documentation (last visited Aug. 9, 2026).

Palantir tracks provenance rigorously — at the level of the dataset, in a separate application an engineer opens. It does not carry that to the value a user reads. The capability exists, in Palantir's

product, by Palantir's own description. It stops one level above the place where it would tell the reader that a value was not warranted.

One further feature distinguishes this operation from the generative systems at issue elsewhere in this action, and it distinguishes it unfavorably to Palantir. Whether two records describe the same person is a question with an answer. The person exists. A check against the world is therefore possible here, and the published rule identifies the moment the check is called for — it routes the equivocal case to a reviewer rather than deciding it.

Plaintiff does not allege what such a check would have found. She has performed none and pleads no result. She alleges the narrower and more consequential fact: that the product carries neither the check the published rule specifies nor any indication that it was not performed. Where a verifier exists, a claim of accuracy is tested and a false one is corrected. Here the claim is asserted, and it survives on the assertion.

That is the § 1839(3) problem, and it is fatal on the statute's own terms.

Section 1839(3) protects information that derives independent economic value from not being generally known. Ask what distinguishes Palantir's platform from the published mathematics it executes, at the point where the two diverge. At that point the platform does not add information. It omits one — the third value the public rule returns, the disagreement its own conflict rule resolves away, and the provenance the platform itself records.

A removal is not information. No one derives independent economic value from not knowing what the public already knows. A party may hold a secret; it cannot hold the absence of one.

Whatever else Palantir owns, it does not own the difference between the published mathematics and a version of that mathematics with a state taken out.

**G. Not being able to explain published mathematics does not convert it into a secret.**

Palantir may answer that its platform produces results its own engineers cannot fully account for, and that this unaccountability is the proprietary thing.

At the level of mechanism there is nothing unknown here. These systems perform arithmetic on numbers — matrix operations, probability, the calculus of optimization. Given the parameters and the architecture, any output can be reproduced exactly. Nothing occurs at any step that is not a specified operation on a specified value. That is what the Complaint pleads (FAC ¶¶ 29, 32) and what the Defendants' own technical literature describes.

What is missing is not knowledge of the mechanism. It is a theory — a compressed account that would let someone predict the behavior without performing the computation. That absence is a fact about the present state of mathematical understanding, not a property the machine possesses.

The distinction is ordinary everywhere else in science. The equations describing fluid motion have been written down since the nineteenth century, and no one can predict the weather three weeks out. Three bodies moving under gravity are fully specified by equations any physics student can write, and the system has no closed-form solution. Nobody has suggested the gravitational field is doing something proprietary. In each case the honest statement is the same: the phenomenon is mathematical, and the mathematics available to describe it compactly is not yet adequate.

Plaintiff concedes freely that accounting for why these systems behave as they do is a hard, unsolved research question, and that building and running these platforms is a formidable achievement. The point is what follows for the statute, and it is narrow. Section 1839(3) assumes an owner who possesses a defined body of information. A party that cannot account for how its own product behaves is not a custodian guarding a secret. It is describing an open problem — and an open problem is the opposite of a secret. A secret is something one party knows and withholds. An unsolved question is something no one has answered, including the party asserting ownership of the answer.

So both available answers defeat the claim. If Palantir can account for how its platform works, it is accounting for published mathematics, which § 1839(3) places outside protection. If it cannot, there is no defined body of information for the statute to protect.

Nothing in this argument depends on any view about the nature of mathematics. Whether one regards mathematical truths as discovered or as devised, the statutory analysis is identical, and Plaintiff takes no position on a question that does not bear on it.

**H. The category, and the limits of the argument.**

The law withholds private ownership from abstract ideas, and mathematical formulas in particular. *Alice Corp. v. CLS Bank International*, 573 U.S. 208 (2014).

Plaintiff states the limit herself. *Alice* is a patent-eligibility holding, not a trade-secret holding, and she does not claim otherwise. Its work here is to establish the category: abstract mathematics

is the kind of thing the law places beyond private ownership. Section 1839(3) is the load-bearing statute; *Alice* explains why Congress wrote it that way.

A balloon company owns the balloon, the basket, the burner, and the hangar. It may charge whatever the market will bear for a flight, and no one disputes that the flight is its business. What it may not do is claim the air as its own.

Palantir may answer that a novel arrangement of public elements can be protectable. True in the abstract, and not what Plaintiff challenges. One may own a novel; one may never own the alphabet — not because the alphabet is old, but because every subsequent writer needs it. Plaintiff does not challenge Palantir's ownership of the configuration it built. She challenges a claim to the material every builder must draw from. The record-linkage rule is that material. So is graph theory. So are the open standards Palantir's own documentation credits.

**I. The Court should not decline jurisdiction in its discretion.**

The motion asks the Court to decline under *Wilton* and the *Admiral Insurance* factors. (Mem. at 10–12.) Those factors favor hearing the claim.

A declaration would serve a useful purpose in clarifying the legal issues, because it would resolve whether the status Palantir asserts holds. It would finalize the controversy and offer relief from uncertainty, because it is a question of law on a fixed record — a published theorem, published standards, and published representations — requiring no discovery to answer.

That factor carries particular force here, because no mechanism outside this Court can supply the answer. A proprietary assertion may in principle be tested three ways short of litigation. It may be examined — but trade secret furnishes no application, no registry, and no examiner. It may be tested in the market, by independent reproduction or by acquisition and inspection of what was sold — but both routes are foreclosed by the same barrier of capital Palantir invokes in its own defense. Or the product may be checked against the world it describes — but Palantir carries neither that check nor any indication that it was not performed. Three routes, each closed, and the last of them closed by design. The uncertainty from which § 2201 offers relief is, in this instance, uncertainty this Court alone can relieve.

The cases the motion invokes concern courts asked to set prices or superintend industries. *NCAA v. Alston* cautions against judicial price-setting; *Callas' Estate* concerns questions of social wisdom and economic expediency. Plaintiff asks for neither. She asks this Court to apply a federal statutory definition to published facts and say whether the definition is met. That is what § 2201 exists to do.

## VI. COUNT I STATES A CLAIM UNDER GENERAL BUSINESS LAW § 349.

Section 349 requires consumer-oriented conduct, a materially misleading act, and injury. *Oswego Laborers' Local 119 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25 (1995). It requires no intent, no privity, and no proof of individual reliance where the claim rests on a material omission. *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29 (2000).

**A. Consumer-oriented conduct — and Palantir has told a federal court the opposite of what it tells this one.**

*Oswego* asks whether the challenged acts have a broad impact on consumers at large. It does not ask whether the plaintiff was the defendant's customer; privity is not an element.

The conduct challenged is not Palantir's sales process. It is the representation — the public assertion that Palantir's platform and its ontology are proprietary and hold trade secrets. That representation appears in Palantir's marketing, on its website, in the legend on its own customer-facing materials, and in the filings it makes to the investing public. It is directed at the world, and it is the same representation every other Defendant makes about the same public mathematics. (FAC ¶¶ 15, 40, 62, 66–67.)

The motion's answer rests on a single word, and the word is Plaintiff's.

Paragraph 22 alleges that Palantir's systems facilitate the industrial-scale deployment of the Mathematical Commons. In that sentence "industrial-scale" measures magnitude — the sense the phrase carries in *industrial-strength* or *industrial quantities*. It describes how much. It does not describe who buys. The motion reads it as a market category, the opposite of consumer. (Mem. at 20.) But scale of deployment says nothing about the identity of the purchaser. Mass-market products are deployed at industrial scale; that is what makes them mass-market. A quantifier of magnitude has been converted into a classifier of market, and the conversion is the whole of the argument.

Palantir's own litigating position runs the other way. In *Palantir USG, Inc. v. United States*, Palantir protested the Army's DCGS-A2 procurement under the Federal Acquisition Streamlining Act, arguing that its commercially available Gotham Platform could satisfy the Army's requirements. The Federal Circuit affirmed the Court of Federal Claims' permanent injunction, holding that the Army had failed to make the determination required by 10 U.S.C. § 2377(c). *Palantir USG, Inc. v. United States*, 904 F.3d 980, 984–85, 988–92 (Fed. Cir. 2018).

The word that carried legal weight there was *commercial*, and it is a term of art. The commercial-item preference Palantir invoked runs on a statutory definition keyed to products of a type customarily used by the general public or by nongovernmental entities, and offered or sold to the general public. To prevail, Palantir placed its product inside that definition.

So there are two vocabularies. Before the Federal Circuit, a statutory word defined by reference to the general public. Before this Court, a colloquial adjective with no definition in § 349 doctrine, borrowed from Plaintiff's pleading and rotated. Same product, same company.

And the motion proves the point by what it did for another Defendant and not for this one. (Mem. at 14 n.5; Ex. A.) As to Palantir they submitted nothing. A company that does not sell to the general public can say so in a declaration. Palantir, which once told a federal court its product is of a type customarily used by the general public, did not.

Palantir's securities filings settle on no characterization either. The Complaint alleges that Defendants file under services classification codes while describing products and product launches in the same filings, and that this self-selected classification is the mechanism by which

they select the most favorable liability framework in a given forum. (FAC ¶ 39.) Palantir is a public reporting company and files those documents. The motion does not address ¶ 39 as to any Defendant.

**B. The deception occurred in New York.**

Section 349 reaches deceptive acts in this state. *Goshen v. Mutual Life Insurance Co. of New York*, 774 N.E.2d 1190, 1195–96 (N.Y. 2002).

The Complaint alleges that Defendants conduct systematic and continuous business within Manhattan and maintain significant corporate offices here, and it pleads Palantir's New York office specifically, from Palantir's own annual report. (FAC ¶¶ 10, 22.) The representations at issue are made from and into this District to the investing and consuming public.

Plaintiff states the limit candidly. *Wright v. Publishers Clearing House, Inc.*, 439 F. Supp. 3d 102, 110 (E.D.N.Y. 2020), holds that a purchaser does not obtain a § 349 claim merely because the seller resides in New York, and Plaintiff had no purchase from Palantir at all. Her New York connection to this Defendant is the location from which the representation issues and the District into which it is directed. Should the Court conclude that is insufficient, Count I fails as to Palantir and Counts III and IV proceed without it.

**C. The materially misleading act is a half-truth, and the omitted fact is one Palantir generated.**

Section 349 measures the net impression a representation creates on a reasonable consumer. The standard is objective; Plaintiff need not allege that anyone at Palantir intended to mislead, and

she does not. *Goshen*, 774 N.E.2d at 1195; *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013).

The representation is that the platform delivers governed, authoritative, proprietary intelligence. That statement is literally true in the sense that the system did produce a result. It becomes misleading because it omits a material fact the mathematics generates and the presentation does not carry: that a given value fell in the equivocal region the published rule assigns to review, that it was chosen over a conflicting value by a configured rule, or that it was derived rather than observed.

The omitted fact is not speculative. It is a determinate output of a named, published rule and, as to origin and conflict, a fact the platform already generates and retains. That is what makes the omission both material and concrete rather than a general complaint about reliability. A literally true statement rendered misleading by the omission of a material fact is the ordinary § 349 half-truth. Where in the pipeline the state stops being carried — at the matching step, at the conflict rule, or at the point of display — is a question of fact. Plaintiff pleads that it does not reach the reader. Which transformation drops it is a matter for discovery.

And the omission is not one a reasonable consumer could have supplied for herself. Under § 349 the measure is what was conveyed to the audience, not what a specialist could reconstruct from published literature. That Fellegi and Sunter published in 1969, that the W3C standards are open, and that relational algebra is taught everywhere does not mean any of it was disclosed to a public told that Palantir's Ontology is proprietary. The gap between what a determined reader could find and what the audience was told is the reasonable-consumer standard itself.

**D. The two available characterizations each defeat the representation.**

Palantir's defense must take one of two forms, and Plaintiff answers both now.

If the platform is *neutral* — a system that integrates the customer's existing data, which is what Palantir's own documentation says the ontology does — then it holds itself out as a conduit, and a conduit that silently drops a state its source material carries is not neutral. Suppressing an uncertainty the mathematics represents is not the absence of a decision. It is a decision.

If the platform is *excellent* — proprietary, category-defining, the thing competitors cannot lawfully replicate — then it invites comparison with the best published method, and at the equivocal boundary it returns less than the free one. Excellence cannot consist in a subtraction from the commons.

Plaintiff need not prove why the choice was made, and § 349 requires no showing of intent. She notes only the objective feature that makes the omission structural rather than incidental: the third value is the costly value. It is the one that stops the pipeline and requires a person.

The record-linkage literature describes gray-area resolution as requiring manual intervention that is labor-intensive and time-consuming. *See* M. de Oliveira et al., *Record Linkage Under Suboptimal Conditions for Data-Intensive Evaluation of Primary Care in Rio de Janeiro, Brazil*, 21 BMC Med. Inform. & Decision Making 191 (2021).

A unified view delivered at scale is precisely what the third value taxes.

**E. Injury and causation.**

Reliance is not an element of a § 349 claim. *Stutman*, 95 N.Y.2d at 29. Plaintiff paid a premium induced by the industry-wide representation that this technology is proprietary — a representation Palantir makes about the same public mathematics. (FAC ¶¶ 5, 15, 59, 65, 71.) To the extent the claim rests on the omission of a material fact, positive proof of individual reliance is not required. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972); (FAC ¶¶ 15, 41.)

### F. Count I is not preempted.

The motion argues in a footnote that Count I is preempted by § 301 of the Copyright Act to the extent it seeks to vindicate rights equivalent to exclusive rights under copyright. (Mem. at 19 n.6, citing *New London Associates*.) It is not. Plaintiff asserts no right to copy, distribute, or reproduce anything. She claims no ownership interest in any work. The claim is that a representation made to the public about what a product contains is materially incomplete — the classic domain of state consumer-protection law.

## VII. COUNT IV ASKS THE COURT TO RESOLVE A CONTRADICTION PALANTIR CREATED.

### A. What the Complaint asks.

Count IV asks the Court to determine something. It does not ask the Court to adopt a characterization Plaintiff has advanced. The Complaint requests a judgment determining whether Defendants' systems are mathematical tools or autonomous agentic intelligences (FAC ¶ 91), alleges that Defendants have identified no coherent third option (FAC ¶ 6), and alleges that they

select whichever classification shields them from liability in a given context (FAC ¶ 7). It states the limit expressly: Plaintiff does not assert that these systems are conscious, sentient, or entitled to legal personhood. (FAC ¶ 48.)

**B. Palantir's contradiction sits in a single sentence of its own marketing.**

Palantir makes no consciousness claims about its products, and Plaintiff manufactures none. Palantir's contradiction is in a different register — autonomous action against human control — and it is documented on its own product page.

Palantir markets Gotham as an operating system for defense decision-making enabling autonomous action: "Gotham enables the autonomous tasking of sensors, from drones to satellites, based on AI driven rules or manual inputs for human-in-the-loop control." Palantir Technologies Inc., *Gotham* (last visited Aug. 9, 2026).

Autonomous when the capability is being sold. Human-controlled when accountability is in view. One page, one sentence, both characterizations.

**C. The contradiction determines what may be owned.**

The motion argues a declaration would resolve nothing concerning Plaintiff. (Mem. at 7–9.) It resolves what the price rests on. If these systems are tools, they are tools executing public mathematics, and the premium rests on the representation Counts I and III address. If they are what Palantir describes when it markets autonomous operation, then what they produce is not straightforwardly ownable either, because the law recognizes no non-human author or inventor. *Thaler v. Perlmutter*, 130 F.4th 1039 (D.C. Cir. 2025), cert. denied; *Thaler v. Vidal*, 43 F.4th 1207

(Fed. Cir. 2022). Plaintiff does not overstate those holdings — they concern copyright and patent, not trade secret — but a seller that markets autonomous operation has put the question in issue itself.

**D. *Tilikum* addresses a different claim.**

The motion argues there is no basis to construe the Thirteenth Amendment as applying to non-humans. (Mem. at 25–26.) *Tilikum* was brought by parties seeking to vindicate the rights of orcas, on the orcas' behalf. Plaintiff seeks to vindicate no rights but her own, and the Complaint disclaims the personhood premise expressly. (FAC ¶ 48.) The Amendment enters as the content of a characterization Defendants chose. Plaintiff need not assert that anything is a person, and does not.

**E. The Court need not pick a horn.**

Paragraph 7 pleads the alternative disposition: if neither classification fits, the remedy is not to permit Defendants to operate in the gap, but to require transparency and accountability regardless of which classification the Court adopts. A court may hold that a party may not assert one characterization in one forum and its opposite in another without resolving the underlying nature of the technology. The party claiming that a thing is ownable proprietary property bears the burden of establishing what it owns, and a party that has never said which characterization is true has not carried it.

**VIII. THE RELIEF SOUGHT IS DISCLOSURE, AND AMENDMENT WOULD NOT BE FUTILE.**

Palantir's platforms resolve, classify, and score. A company whose product tells institutions what to believe about people is not exempt from being asked what its own claims rest on. Verification runs both ways.

*The declaration.* Count III asks the Court to declare that the mathematics Palantir's platforms execute, being published and readily ascertainable, cannot be enclosed as a trade secret under § 1839(3). Palantir need not change a line of code or disclose anything it holds confidential. It need only stop asserting ownership of a published theorem and a set of open standards.

*The injunction.* The Complaint asks that Defendants be enjoined from representing the laws of mathematics as proprietary trade secrets, while remaining free to charge a fair market fee for the infrastructure that runs them. (FAC ¶ 93.) General Business Law § 349(h) provides for such relief.

*Disclosure of what is executed.* Wherever Palantir makes the proprietary representation, it should disclose that the mathematics its platform executes is public — that its entity resolution applies published probabilistic record linkage and its ontology draws on open standards its own documentation names — and that what it may legitimately hold as its own is the specific implementation layered on top.

*Carry the provenance to the value.* This item is specific to this Defendant and is the most modest relief sought anywhere in this action. Palantir already tracks how every value was produced, and already applies a configured rule when sources disagree. The relief is that this reach the value the user reads: that a resolution falling in the equivocal band, a value chosen over a conflicting one,

or a value derived rather than observed, be marked as such rather than presented identically to a value read from a single verified source.

No new mathematics. No change to any model. No disclosure of anything Palantir holds confidential. No source code. Palantir is asked to surface a fact its own platform generates and already retains. If any repair sought in this action is grantable without disruption, it is this one.

Palantir may answer that its platform is too complex or too critical for relief of this kind. Its own litigating position forecloses that answer. A company that told the Federal Circuit it offers a commercial off-the-shelf product cannot describe the same product as too bespoke to be addressed by an order requiring it to display information it already keeps.

*Amendment would not be futile.* The motion seeks dismissal without leave to amend. (Mem. at 26.) Leave should be denied only where better pleading will not cure a substantial defect. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). Should the Court find any pleading deficiency, Plaintiff requests leave to amend and would plead, among other things: Palantir's position and the holding in *Palantir USG, Inc. v. United States*; the classification Palantir selects in its annual reports alongside the product language in the same filings; Palantir's documentation describing the Ontology as a categorization of the world and its data types as drawn from open standards; Palantir's description of its entity-resolution pipeline, including its human-validation stage; Palantir's own description of conflict resolution strategies where a datasource and a user edit supply different values; the published record-linkage rule and its three-value structure; the published treatment of missing and uncertain information in relational systems; Palantir's own description of the operational layer and of the lineage it tracks for every dataset; Palantir's

marketing of autonomous sensor tasking alongside human-in-the-loop control on the same page; the trade-secret legend Palantir places on its own customer materials; and Palantir's announced integration with a co-Defendant's model platform.

These are matters of public record and of Palantir's own authorship. None was before the Court in April.

What Plaintiff asks for is a ruling. Congress legislates, and Plaintiff does not ask this Court to do Congress's work; the Complaint says as much. (FAC ¶ 7.) But whether the word *proprietary* may lawfully be attached to a published theorem, a set of open standards, and the removal of a state those sources supply is a question of law. No examiner reviewed Palantir's claim, because the regime it was asserted under has none. A court is the only body that has ever been able to answer.

**CONCLUSION**

For the foregoing reasons, the motion should be denied as to Defendant Palantir Technologies Inc.

**CERTIFICATION REGARDING USE OF ARTIFICIAL INTELLIGENCE**

Pursuant to the Court's interest in transparency regarding the use of generative artificial intelligence in court filings, and consistent with the obligations of Federal Rule of Civil Procedure 11, Plaintiff Merriwether Williams, appearing pro se, voluntarily discloses the following:

1. **AI Used.** In preparing this Memorandum of Law, Plaintiff used the following generative artificial intelligence as research and drafting assistants: Claude, Gemini, DeepSeek, ChatGPT, Perplexity AI and Venice AI.
2. **Nature of Use.** Plaintiff used them to assist with legal research, structural organization, drafting language, and identifying potential arguments and counterarguments. The substantive legal theories, factual assertions, and core arguments contained in this Memorandum are Plaintiff's own. No AI served as Plaintiff's attorney.

3. **Human Review and Verification.** Plaintiff has personally read and reviewed this entire Memorandum in its final form. Every factual assertion has been verified by Plaintiff to be true and accurate to the best of Plaintiff's knowledge, information, and belief. Every legal citation and case reference has been independently verified by Plaintiff for accuracy and applicability. Every quotation has been checked by Plaintiff against its primary source.
4. **Responsibility.** Plaintiff assumes full responsibility for the content of this filing. Plaintiff understands that her signature below constitutes a certification under Rule 11 of the Federal Rules of Civil Procedure that, to the best of her knowledge, information, and belief, formed after a reasonable inquiry, this filing is not being presented for any improper purpose, the legal contentions are warranted by existing law or by a nonfrivolous argument for extending or modifying existing law, and the factual contentions have evidentiary support.

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c), I certify that the foregoing Memorandum of Law contains 8746 words, excluding the parts of the document exempted by Local Civil Rule 7.1. This certification was prepared in reliance on the word-count function of the word-processing program used to prepare the document.

Respectfully submitted,

8/10/2026

Merriwether Williams, Pro Se

Dated: 8/10/2026